1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ROBERT ELLIOT,                              No.  2:10-cv-02980 MCE KJN P

12                 Plaintiff,

13          v.                                   ORDER and

14   SHANKARI REDDY, et al.,                     FINDINGS AND RECOMMENDATIONS

15                 Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, who proceeds in forma pauperis and with appointed counsel, in

19   this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action proceeds on plaintiff's

20   claims that the two remaining defendants, Dr. Shankari Reddy, M.D., and Dr. Phillip Beck, M.D.,

21   were each deliberately indifferent to plaintiff's serious medical needs; plaintiff also asserts state

22   law claims that each defendant was medically negligent, and violated California Civil Code

23   section 52.1.

24          Pending before the court are separate motions for summary judgment filed by defendants

25   Beck and Reddy.  These matters were heard on the court's April 24, 2014 law and motion

26   calendar.  Plaintiff was represented by his court-appointed attorney, Mr. Jacob Lubarsky;

27   defendant Beck was represented by Ms. Stephanie Roundy; defendant Reddy was represented by

28   Deputy Attorney General Mr. Oliver Lewis.

                                               1

For the reasons that follow, the undersigned recommends that defendant Reddy's motion for summary judgment be granted in its entirety, and that defendant Beck's motion for summary judgment be granted in part (on plaintiff's Section 52.1 claim), and denied in part (on plaintiff's deliberate indifference and medical negligence claims).

II. Background

This action proceeds on plaintiff's Second Amended Complaint (SAC), against defendants Dr. Shankari Reddy, M.D., and Dr. Phillip Beck, M.D. (ECF No. 88.) The SAC is premised on plaintiff's allegations that defendant Dr. Beck, a consulting urologist, and defendant Dr. Reddy, plaintiff's primary care physician at Folsom State Prison, were deliberately indifferent to plaintiff's serious medical needs by recommending the surgical removal (nephrectomy) of plaintiff's left kidney, and Dr. Beck performing the nephrectomy, based on an incorrect diagnosis of kidney cancer. Plaintiff asserts that defendants ignored medical evidence contraindicating surgery, failed to conduct additional diagnostic tests or procedures, and improperly discredited plaintiff's statements that he had no relevant symptoms or family history.

Previously, on March 27, 2013, the court granted, without leave to amend, the motions to dismiss plaintiff's First Amended Complaint filed by defendants McHenry Medical Group, Doctors Medical Center of Modesto, Doctors Hospital of Manteca, and Dr. Alexander Liu. (ECF No. 87.) The court granted, with leave to amend, the motions to dismiss filed by defendants Beck, Reddy, Monteiro, Sahota, Gabriel, Fransham and Walker. (Id.)

On April 25, 2013, plaintiff filed the operative SAC, which omitted claims against defendants Dr. Sahota, Dr. Gabriel, and correctional officers Fransham and Walker (ECF No. 88), who were therefore dismissed from this action (ECF No. 95). Of the remaining three defendants (Beck, Reddy and Monteiro), only Dr. Beck filed a motion to dismiss the SAC. (ECF No. 90.) On June 27, 2013, the court dismissed plaintiff's state law claims pursuant to California Civil Code section 51.7 (Ralph Act), and California Code of Civil Procedure section 425.13 (punitive damages), as to all defendants. The court denied Beck's motion to dismiss on all other grounds, thus ruling that this action would proceed against defendants Beck, Reddy and Monteiro, on the following claims: (1) Eighth Amendment deliberate indifference to serious medical needs;

1    (2) state law medical negligence; and (3) California Civil Code section 52.1.  (ECF No. 95.)

2           Defendant Collette Monteiro, R.N.,was dismissed from this action on March 20, 2014, at

3    plaintiff's request.  (See ECF Nos. 116, 122, 124.)

4           Defendant Beck filed his instant motion for summary judgment on February 7, 2014.

5    (ECF No. 106.)  Defendant Reddy filed her instant motion for summary judgment on March 14,

6    2014.  (ECF No. 119.)  The court consolidated these matters for hearing on April 24, 2014.  (ECF

7    Nos. 121, 125.)

8    III.  Legal Standards for Summary Judgment

9           "The court shall grant summary judgment if the movant shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

11   Civ. P. 56(a).

12              Under summary judgment practice, the moving party always bears
13              the initial responsibility of informing the district court of the basis
                for its motion, and identifying those portions of "the pleadings,
14              depositions, answers to interrogatories, and admissions on file,
                together with the affidavits, if any," which it believes demonstrate
15              the absence of a genuine issue of material fact.

16   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

17   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

18   only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

19   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

20   387 (9th Cir. 2010) (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

21   Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

22   burden of production may rely on a showing that a party who does have the trial burden cannot

23   produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

24   should be entered, after adequate time for discovery and upon motion, against a party who fails to

25   make a showing sufficient to establish the existence of an element essential to that party's case,

26   and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  "[A]

27   complete failure of proof concerning an essential element of the nonmoving party's case

28   necessarily renders all other facts immaterial."  Id. at 323.

1        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

2    the opposing party to establish that a genuine issue as to any material fact actually exists.  See

3    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4    establish the existence of such a factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material in support of its contention that such a

7    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

12   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

13   (9th Cir. 1987).

14       In the endeavor to establish the existence of a factual dispute, the opposing party need not

15   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

16   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

17   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

18   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

19   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) Advisory Committee's Note to 1963

20   Amendments).

21       In resolving a summary judgment motion, the court examines the pleadings, depositions,

22   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

23   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

24   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

25   drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

26   not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

27   from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

28   1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a

1    genuine issue, the opposing party "must do more than simply show that there is some

2    metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead

3    a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

4    Matsushita, 475 U.S. at 586 (citation omitted).

5    IV.  Undisputed Facts

6          The court has reviewed defendants' respective Statements of Undisputed Facts (ECF Nos.

7    106-1 and 119-1); plaintiff's Statements of Disputed Facts (ECF Nos. 130, 137); plaintiff's

8    Admissions and Denials in Response to defendants' undisputed facts (ECF Nos. 131, 138); and

9    defendant Reddy's reply thereto (ECF Nos. 142-1).  When relied upon by the parties, the court

10   has also reviewed plaintiff's medical record; the deposition transcripts of plaintiff, both

11   defendants, and Dr. Sahota; and the declarations of defendant Reddy and the parties' respective

12   medical experts, Dr. Dall'Era, Dr. West, and Dr. Anderson, and the parties' related evidentiary

13   objections.  The following facts are undisputed by the parties or, following the court's review, are

14   deemed undisputed for purposes of the pending motion.

15         1.  At all times relevant to this action, plaintiff was a prisoner incarcerated at Folsom State

16   Prison (FSP), under the authority of the California Department of Corrections and Rehabilitation

17   (CDCR).

18         2.  At all times relevant to this action, defendant Shankari Reddy, M.D., who is board

19   certified in Family Practice, was a physician and surgeon employed by CDCR at FSP.

20         3.  At all times relevant to this action, defendant Phillip Beck, M.D., who is board

21   certified in Urology, was a urologist in private practice who provided consultative medical

22   services to CDCR inmates through the McHenry Medical Group, Doctors Medical Center of

23   Modesto, and/or Doctors Hospital of Manteca.

24         4.  Plaintiff, who was born on August 9, 1951, arrived at FSP in March 2007 (at age 55),

25   with a diagnosis of Refractory Hypertension; plaintiff was taking anti-hypertensive medications

26   with poor control.

27         5.  In July 2008, plaintiff underwent a 24-hour urine test, ordered by defendant Dr. Reddy,

28   that indicated an elevated Total Metanephrine reading of 891, which may be consistent with

Pheochromocytoma, a tumor of the adrenal glands.  (ECF No. 119-1 at 6 (Reddy Exh. A).)  On

July 31, 2009, Dr. Reddy submitted a Physician Request for Health Care Services (Form 7234),

for "CT of abdomen + pelvic with contrast to R/O [rule out] adrenal tumor."  (ECF No. 111 at 10

(Beck Exhs.).)  On October 15, 2009, Dr. Reddy's treatment notes include the notation "CT abd

pnd."  (Id. at 8.)  A similar notation is in Dr. Reddy's November 17, 2008 treatment notes.  (Id. at

7.)

     6.  On November 26, 2008, plaintiff had a CT scan of his abdomen and pelvis, conducted

by Mercy Imaging Center, which showed "normal adrenal glands," but a "4 cm low attenuation in

the upper pole of the left kidney, which could be related to poor vascular enhancement during the

early corticomedullary phase."  (ECF No. 119-1 at 8-9 (Reddy Exh. B).).  The radiologist opined

that "[a] true neoplasm could not be excluded.  A triphasic CT is recommended with precontrast

and postcontrast scanning.  The postcontrast scan should be performed at delays of 20 and 100

seconds . . ."  (Id.)

     7.  Dr. Reddy testified at her deposition that her signature at the top of the Mercy Imaging

Center report of plaintiff's November 26, 2008 CT scan, and notations at the bottom of the report,

indicate that she discussed the results of this scan with plaintiff.  (Reddy Depo. (ECF No. 140 at

159-61).)  However, Dr. Reddy stated that she did not know "what a [triphasic] CT with pre- and

post-contrast scanning is."  (Id. at 160.)

     8.  On December 22, 2008, Dr. Reddy's treatment notes indicate "CT Abd – rec: Triphasic

CT abd – 7234 [Physician Request for Health Care Services Form 7234] done to R/O L kidney

mass."  (ECF No. 111 at 6 (Beck Exhs.).)  In her treatment notes dated February 13, 2009, Dr.

Reddy noted "abn. CT abd – awaiting Triphasic CT abd – D/w C/LVN to expedite – R/O L

kidney mass."  (Id. at 5.)

     9.  On February 27, 2009, plaintiff had a Triphasic CT scan, conducted at Doctors

Hospital of Manteca.  The scan showed a "3 cm well circumscribed hypodense mass occupying

the upper pole of the left kidney," described as "probably a solid lesion of indeterminate nature."

(ECF No. 119-1 at 11 (Reddy Exh. C); ECF No. 140 at 5 (Pltf. Exh. A); ECF No. 127 at 4 (Pltf.

Exh. A).)  Administration of intravenous contrast material "caused a slight contrast enhancement

1   from 7 Hounsfield units to 9 Hounsfield units." (Id.)  The radiologist opined that a urological

2   consultation was warranted.

3       10.  Dr. Reddy testified that her notations at the bottom of the report of plaintiff's

4   February 27, 2009 Triphasic CT Scan indicate:  (1) that Dr. Reddy reviewed the report (ECF No.

5   140 at 191); (2) that, on March 5, 2009, Dr. Reddy wrote "Ducat MO [Medical Officer] line,"

6   indicating that she was instructing the medical technician to provide plaintiff with a ducat so that

7   she could discuss with him the results of the report; and (3) that, on March 13, 2009, Dr. Reddy

8   noted that "Patient refused MO line appointment." (Reddy Depo. (ECF No. 140 at 162-64).)  Dr.

9   Reddy did not recall whether she later discussed the results of the February 2009 Triphasic CT

10  Scan with plaintiff.  (Id.)

11      11.  On March 27, 2009, plaintiff was seen by urologist Dr. James Hendricks, at Queen of

12  the Valley Medical Center, who found plaintiff's prior CT scan unhelpful because the post-

13  contrast images were "too delayed."  Dr. Hendricks recommended that plaintiff have "a full renal

14  mass protocol CT scan."  (ECF No. 119-1 at 14-5 (Reddy Exh. D).).

15      12.  On April 3, 2009, plaintiff had a Renal Mass Protocol CT Scan, ordered by defendant

16  Dr. Reddy, and conducted at Napa Valley Imaging Center, which "confirmed" a "mildly

17  hyperdense mass within the upper pole of the left kidney," measuring 2.5 x 3.1 x 2.8 cm.  (ECF

18  No. 119-1 at 17-81 (Reddy Exh. E); ECF No. 109 at 9-10 (Beck Exhs.); ECF No. 140 at 7-8 (Pltf.

19  Exh. B); ECF No. 127 at 6-7 (Pltf. Exh. B).)  Viewing the kidney before and after the IV

20  administration of contrast material, the radiologist made the following findings (ECF No. 140 at

21  7):

> [The mass] is slightly denser than the renal parenchyma on the noncontrast imaging with a Hounsfield units measurement of 41-42.  Following the administration of contrast material on the venous phase, the density appears to remain stable or increase slightly to approximately 44 Hounsfield units and this persists on the delayed images.   This level of apparent minimal enhancement of approximately 10% is equivocal and much less than usually seen with a renal cell carcinoma.   The appearance of the mass is homogeneous and I do not see any evidence for invasion of adjacent structures.  The renal collecting system does not appear to be involved with this mass which is in the superior aspect of the kidney.

7

The radiologist concluded in pertinent part (id. at 7-8):

> Mildly hyperdense mass within the upper pole of the left kidney is confirmed. This may enhance very slightly with contrast material which is of concern for renal cell carcinoma but the amount of enhancement is less than that usually seen with neoplasm. By imaging criteria therefore, this remains in the equivocal range and is a Bosniak Category 2F lesion which requires follow-up. I recommend an ultrasound as the next step in evaluation if this has not already been performed. This may represent a hemorrhagic cyst and if this can be confirmed at ultrasound, this would be very reassuring. Alternatively, either dynamic MRI of the kidney or follow-up CT scan could be performed depending on the patient's clinical situation to be certain this lesion remains stable or decreases in size. Concurrent review with second radiologist.

13. Dr. Reddy testified that the notations at the bottom of the April 3, 2009 CT scan report indicate that a nurse practitioner, Larissa Lysek, discussed these results with plaintiff on April 9, 2009. (Reddy Depo. (ECF No. 140 at 164-66).) Dr. Reddy did not recall discussing these results with plaintiff. (Id. at 166.) Dr. Reddy testified that she did not know "what the Bosniak scale is." (Id. at 167.) Plaintiff's FSP treatment notes for April 9, 2009, written by Nurse Practitioner Lysek, indicate in pertinent part: "L kidney mass, 2.5 x 3.1 x 2.8 cm, [upper] pole (per CT 4/3/09); Form 7234 RFS [Ultrasound] of L kidney ASAP – submitted." (ECF No. 111 at 4 (Beck Exhs.).)

14. On April 22, 2009, plaintiff had a renal ultrasound. The radiologist opined that "[t]he left kidney . . . shows no obvious focal abnormality of the cortex. No hyrdonephrosis or nephrolithiasis is identified of either kidney[]. . . . No focal mass demonstrated of the kidneys, especially on the left as reported. Followup CT scan should be considered." (ECF No. 119-1 at 20 (Reddy Exh. F); ECF No. 109 at 8 (Beck Exhs.); ECF No. 140 at 10 (Pltf. Exh. C); ECF No. 127 at 9 (Pltf. Exh. C).)

15. Dr. Reddy testified that her notations indicate that she read the report of plaintiff's April 22, 2009 Renal Ultrasound, and discussed the results with plaintiff on May 6, 2009; Dr. Reddy testified that she recalled discussing these results with plaintiff but does not recall his response. (Reddy Depo. (ECF No. 140 at 167-71, 191-92).) In an Interdisciplinary Progress Note dated May 6, 2009, Dr. Reddy noted in pertinent part: "Abnormal CT of the kidneys earlier this year. Seen urology at Queen of the Valley who recommended kidney CT and ultrasound,

8

1   renal.  No abnormal cyst or mass noted on the ultrasound done on April 22, 2009.  We will do a

2   followup CT kidney in 6 months."  (ECF No. 111 at 2 (Beck Exhs.).)

3       16.  Dr. Reddy's treatment notes for June 11, 2009, state in pertinent part:  "Abn CT

4   kidney – rec:  F/U CT kidney in 5 months."  (ECF No. 110 at 15 (Beck Exhs.).)

5       17.  Dr. Reddy's treatment notes for August 4, 2009, state in pertinent part:  "Abn. CT

6   scan kidney – F/U CT in 3 mos.  7234 done."  (Id. at 14.)

7       18.  On August 25, 2009, plaintiff had a Surveillance Renal CT Scan, with and without

8   contrast, ordered by Dr. Reddy.  The report of the radiologist states that a "hypodense mass" was

9   identified within the "upper pole of plaintiff's *right* kidney" (emphasis added), measuring 2.9 x

10  2.5 cm.  (ECF No. 119-1 at 22-3 (Reddy Exh. G); ECF No. 109 at 5-6 (Beck Exhs.); ECF No.

11  127 at 11-2 (Pltf. Exh. D); ECF No. 140 at 12-3 (Pltf. Exh. D).)  The radiologist opined that this

12  "*left* kidney mass" (emphasis added) did "not have the characteristics of a simple cyst," but was

13  "suspicious for a primary renal neoplasm such as renal cell carcinoma."  (Id.)  The report

14  indicates that there was "[n]o prior study for comparison."  (Id.)

15      19.  On September 4, 2009, plaintiff was seen by Dr. Reddy as a follow-up to his August

16  25, 2009 CT scan.  Dr. Reddy testified that the August 25, 2006 CT scan "was the first CT scan

17  of Mr. Elliot's kidneys that [she] observed."  (Reddy Depo. (ECF No. 140 at 158-59); see also

18  ECF No. 119 at 25 (Reddy Exh. H) (Sept. 4, 2009 treatment note that "Pt seen for Abn CT scan

19  abd 9/2/09 + 7234 urology appt. done on 9/2/09").)  Dr. Reddy requested consultation with a

20  urologist, based on the August 25, 2009 CT scan finding of a "hypodense mass upper pole L

21  kidney suspicious for renal neoplasm."  (Id. at 27 (Reddy Exh. I).)

22      20.  On September 23, 2009, plaintiff was seen for the first time by Dr. Beck, who

23  reviewed the images of plaintiff's August 25, 2009 CT scan during plaintiff's appointment; Dr.

24  Beck testified that he did not recall reviewing any other diagnostic evaluations, or any other

25  material prior to seeing plaintiff at this appointment, which he recalled was about an hour long.

26  (Beck Depo. at 45-6, 51-3 (ECF No. 107 at 13-5).  In his written report, Dr. Beck provided the

27  following History of Present Illness (ECF No. 110 at 10):

28  ////

9

> This  57-year-old male had a CT scan back in April 2009 which showed a hypodense mass in the upper medial aspect of the left kidney about 3 cm in size.  I am not certain why he had this test done and he is not able to tell me either.  Otherwise, it was repeated for (sic) months later and again shows minimal enhancement, but is not inhomogeneous consistent with renal cell carcinoma.[1]   The chest part of the CT scan was negative.

Dr. Beck made the following Assessment and Plan (id. at 11):

> I counseled this patient at length about the possible diagnosis of renal cell carcinoma, that I am about 95% certain that it represents that and that the most effective treatment for him would be a nephrectomy.  He absolutely refuses to have anything done, so I again counseled him about the possible diagnosis and possible consequences of his decision, but he is firm in his decision not to pursue treatment.

21.  In his written response on the CDCR Form 7234 requesting his services, Dr. Beck made the following findings (ECF No. 119-1 at 27 (Reddy Exh. I)):

> I reviewed CT scans & did H&P [history and physical].  I believe he has a 3 cm renal cell CA [carcinoma] lft kidney.  I recommend that he have radical nephrectomy (could do hand asst laparoscopy).  He refuses to have treatment.  I explained to him the consequences of that decision but he persists.

22.  In response to questioning by plaintiff's attorney, Dr. Beck testified at his deposition as follows concerning his initial appointment with plaintiff (Beck Depo. at 35-6, 46-8, 54 (ECF No. 107 at 14-6)):

> Q.   Did you tell Mr. Elliot that you thought there is a high probability that it was cancer in his kidney at the first time you met him?

> A.  Yes.

> Q.  Did you tell him anything else at that time?

> A.  I told him that . . . the CT scan looked like a cancer, that the lesion in his left kidney looked like a cancer to me, that kidney cancer is a fairly unique type of cancer and the best treatment for it is to remove the kidney. . . . [A]t that point he said, no, I don't want anything done.  I'm not having surgery.  I'm not having anything, and that ended the visit.

> Q.  Did you offer him or suggest to him that he have any additional

---

[1]     Dr. Beck testified that "inhomogeneous" was a typographical error in his report, and should have read "homogeneous;" that, as written, the phrase indicates that the mass was inconsistent with renal cell carcinoma.  (Beck Depo. at pp. 40-2 (ECF No. 107 at 12-3)).

1   diagnostic procedures performed?

2   A.  No.  What I did do I said to him are you aware of the possible
consequences of your decision, that if this is a cancer it could be
3   fatal; you could die from it.  It could cause you a lot of pain and
problems, and it could be fatal.

4
Q.  And do you recall at that time what Mr. Elliot's reaction was?

5
A.  He said I don't want anything done.  Nobody is cutting on me. .
6   . .

7   Q.  . . . [D]o you recall how or what you said to Mr. Elliot as you
counseled him at length?

8
A.  Pretty much.

9
Q.  What did you tell him?

10
A.  Okay.  So I did a history and physical.  I reviewed his CT scan.
11   I had it up on the wall, and I pointed to the lesion and showed him
what we were talking about, and I said it looks like a cancer.  It's
12   possibly a cancer in your kidney.  And if it's a cancer, then it needs
to come out.  Our No. 1 treatment for cancer of the kidney is to
13   remove the kidney.  Chemotherapy doesn't really work and
radiation therapy doesn't really work.  The best shot of cure for
14   renal cell carcinoma is to remove the kidney.  He at that point said
nobody is cutting on me.  Nobody is cutting on my body.  I said,
15   okay, you need to be aware of the consequences of that decision if
this is a concern, so I talked to him about it.

16
Q.  So you told him that there was a possibility that this was cancer,
17   is that correct?

18   A.  Yes.

19   Q.  Well, it says here that you said you were 95 percent certain that
it was cancer, is that right?

20
A.  Yes.

21
Q.  And how did you come to that 95 percent figure?

22
A.  Experience.

23
Q.  . . . Did you base your 95 percent figure solely on the CT scan?

24
A.  Yes.

25
Q.  And you recommended to Mr. Elliot that he have his kidney
26   removed, is that correct?

27   A.  Yes.

28   Q.   And  that  was  just  based  on  the  one  CT  scan  and  your

11

experience?

A.  Yes.

. . . Q.  Is there any way for you to estimate . . . how many kidneys you removed before September 23rd, 2009?

A.  My guess would be one to 200 (sic), possibly more.

Q.   And of those one to 200 possibly more kidneys that you removed prior to Mr. Elliot's initial visit with you, were any of those removed because of renal cell carcinoma?

A.  Nearly all of them.

Q.  And of those one to 200 that you removed because of renal cell carcinoma, did any of them turn out to be not renal cell carcinoma?

A.  It happens very rarely. . . .

Q.   . . . Did you offer Mr. Elliot any additional diagnostic procedures to confirm that he had renal cell carcinoma?

A.  No.

23.  Dr. Beck testified that he didn't recall whether he knew, at the time of plaintiff's September 23, 2009 appointment, that plaintiff had another CT scan prior to August 25, 2009. (Beck Depo. at 30 (ECF No. 107 at 10).)

24.  Plaintiff testified at his deposition that his initial appointment with Dr. Beck was about 10-15 minutes long, and that Dr. Beck did not examine plaintiff but simply informed him that he had cancer, stating that plaintiff had "91 percent cancer . . . the 9 percent is a no-brainer;" and that the cancer "can go in your lungs, your heart, and then your brain, and you'll perish in prison . . . You got six months to live. . . . ."  Plaintiff testified that he answered "no" to Dr. Beck's questions whether his urine odor was strong, whether he was urinating or defecating blood, whether he was fatigued, tired or sore; plaintiff stated that he told Dr. Beck that cancer didn't run in his family.[2]  Plaintiff testified that Dr. Beck rejected plaintiff's requests for a biopsy, a second opinion, or chemotherapy in lieu of surgery.  Plaintiff said that he told Dr. Beck he

---

[2]     Plaintiff testified he told his providers that, while some members of his family had kidney problems, these problems did not include cancer.  Plaintiff testified that his mother, then age 95, had kidney disease and was on dialysis; and that his nephew recently passed away at age 39 or 40, due to noncancerous kidney problems.  (Pltf. Depo. (ECF No. 140 at 62-3).)

1   would not have the surgery.  (Pltf. Depo. (ECF No. 140 at 80-5; 140-42).

2        25.  On September 23, 2009, upon plaintiff's return to FSP from his appointment with Dr.

3   Beck, the admitting nurse, Edward Pineda, noted plaintiff's statements that, "Per consultant, he

4   believes CT scan L kidney reveals a 3 cm renal cell CA and recommends a radical nephrectomy.

5   I/M still not sure if he will consent or not but he said he will discuss it with his PCP [primary care

6   provider]."  (ECF No. 110 at 12 (Beck Exhs.).)  Mr. Pineda advised plaintiff to "follow MD's

7   advices/recommendations.  Such are very important.  I/M understood the instruction.  States he

8   will talk to his PCP."  (Id.)

9        26.  On September 24, 2009, Dr. Reddy recounted to plaintiff Dr. Beck's

10  recommendation.  Dr. Reddy's treatment notes provide (ECF No. 110 at 9 (Beck Exhs.)):

11          Pt. here to discuss urology C/S – yest. – 9/23/09 @ DHM –
            recommended – nephrectomy L secondary to renal cell mass/cancer
12          L side.

13          Pt. refuses at this time – Expl. importance of following
            Dr's/specialist's instructions.  Expl. Seq. Renal CA leading to
14          death.  Pt. states he needs time to think about it and will let us know
            soon if he is desiring to have surgery or not.  Will follow.
15

16       27.  Plaintiff testified that the first time he spoke with Dr. Reddy after seeing Dr. Beck,

17  she supported Dr. Beck's recommendation, emphasized that plaintiff probably had only six

18  months to live, noted that two other prisoners at FSP had recently died and explained that plaintiff

19  may be next.  (Pltf. Depo. (ECF No. 140 at 86-91).)  Plaintiff testified that, between April 2009

20  and October 2009, Dr. Reddy "was really traumatizing plaintiff," repeatedly trying to persuade

21  plaintiff (at biweekly appointments) to have the surgery, even sending a nurse to plaintiff's cell to

22  ask if was going to have the surgery.  (Id.)  He testified that Dr. Reddy pressured him to have the

23  surgery every time he went to her office.  (Id. at 114-18.)

24       28.  Plaintiff testified that he relied on the opinions of Dr. Reddy and Dr. Beck, because

25  neither explained to him the results of any of his tests or procedures.  (See, e.g., id. at 96, 98, 100,

26  120-21.)  Plaintiff testified that Dr. Reddy was always courteous to him, but refused to disclose

27  test results because she was not a specialist.  (Id. at 119-20.)

28  ////

29.  Plaintiff testified that he first tried to keep healthy with diet and exercise, then spoke with family members, who encouraged him to have the surgery.  Plaintiff decided to have the surgery after talking with his sister and girlfriend.  (Id. at 88-91.)  Plaintiff testified that he consented to surgery "[b]ecause I was stressed out. . . . They [defendants] kept telling me, 'You're going to die.  You're going to die without surgery.  You're going to die in prison, and you have 91 percent cancer, and it's spreading."  (Id. at 137.)

30.  On October 6, 2009, Dr. Reddy examined plaintiff and again discussed with him Dr. Beck's recommendation.  (ECF No. 119-1 at 32; ECF No. 110 at 8.)  Dr. Reddy's treatment notes indicate that plaintiff agreed to proceed with Dr. Beck's surgical recommendation.  (Id.; see also ECF No. 140 at 186-87 (Reddy Depo.).)

31.  On October 6, 2009, Dr. Reddy completed a Form 7234, requesting that plaintiff have a left nephrectomy; she provided the following explanation of "Medical Necessity" (ECF No. 119-1 at 34; Reddy Depo. (ECF No. 140 at 186)):

> 58-year-old . . . male saw urology at Doctors Hospital Manteca on 9/23/09 secondary to left kidney mass on CT abdomen.  Done secondary to abnormal matanephrines. Patient was recommended to have left nephrectomy done.  Patient agrees to this procedure at this time.  Patient has history of hypertension, diabetes II, hyperlipidemia and hepatitis C.

Dr. Reddy testified that she submitted this request after plaintiff agreed to the surgery because she was "follow[ing] the consultant's recommendation."  (Reddy Depo. (ECF No. 140 at 197).)  The request was approved by the Utilization Management Nurse, former defendant C. Monteiro, R.N., on October 8, 2009.  (ECF No. 119-1 at 34.)

32.  Dr. Reddy's treatment notes for plaintiff on November 2, 2009 state in pertinent part: "L kidney mass on CT – seen urology 9/23/09 DHM – awaiting nephrectomy appt. 11/10/10." (ECF No. 110 at 7 (Beck Exhs.).)

33.  On November 6, 2009, plaintiff had a pre-operative chest x-ray (ECF No. 113 at 9; ECF No. 109 at 4) and, on November 10, 2009, plaintiff was admitted to Doctors Medical Center for a "left hand assisted laparoscopic nephrectomy possible open left nephrectomy" (id. at 10-11).

////

14

34.  Dr. Beck testified that, on November 10, 2009, he was surprised to see plaintiff in the operating room, as he had not seen him since his initial consultative appointment on September 23, 2009.  Dr. Beck testified as follows (Beck Depo. at 58-9 (ECF No. 107-1 at 1)):

> He was scheduled for surgery unbeknownst to me, actually.  The prison spoke to my scheduling person.  She went ahead and scheduled him, didn't actually tell me about it so we're very busy so there's times that happens.  And so I arrived in the operating room and there he is amongst other patients.  I said, "So what are you doing here?  What happened?  Did you change your mind?  What's going on?"
>
> He said, "Well, if it's a cancer, I want it out."
>
> I said, "Well, wait a minute," I said, "We're not absolutely sure it's a cancer.  We need to do some other tests," and I said, "You know, we need to at least know that your other kidney is functioning well and that there's no spread of it anywhere else.  You need a chest X-ray and possibly a bone scan and some other things done."  So I said, "We're not going to do it today."  I said, "Are you sure you want to do this?  Are you sure you want to proceed with this because you were really adamant before."
>
> He said, "Well, if it's possibly a cancer, I want to take care of it."
>
> So, okay, we canceled.

35.  Plaintiff's recollection of this interaction was that medical staff prepared plaintiff for surgery, then rolling him into the operating room; when Dr. Beck came out, he said, "Stop the surgery," or "Cancel it."  (Pltf. Depo. (ECF No. 140 at 92-3; see also ECF No. 109 at 11).)  Plaintiff testified that Dr. Beck said, "[W]e have to do more testing . . . to see if the left – the right kidney can hold up from the left. . . . [I]f we take the left out, will the right be able enough – be healthy enough to hold your flow."[3]  (Id. at 94-5.)  When asked by Dr. Beck why he had changed his mind, plaintiff reportedly explained, "I'm trying to save my life. . .  I've been sweating about 'You going to die.  You got cancer,' and all this, you know, I don't want to die in prison."  (Id. at 94.)

////

---

[3]    Consistently, the medical notes upon plaintiff's re-admission to FSP on November 10, 2009, following the cancellation of his surgery, reflect plaintiff's statement that "[t]hey didn't do nothing because the doctor wanted to do more test[s] before I have surgery."  (ECF No. 119-1 at 36; ECF No. 110 at 6.)

15

1    36.  Dr. Beck ordered the following procedures:  (1) a chest x-ray (which had already been

2    done); (2) lab work; (3) a differential renal functional scan (renal flow study); and (4) a bone

3    scan.  Dr. Beck testified that the bone scan was for the purpose of detecting any metastases,

4    explaining that, "Renal cell carcinoma can go to bones.  If it goes to bones, it's out of the bag and

5    nephrectomy is usually not indicated."  (Beck Depo. at 60 (ECF No. 107-1 at 1).)  Dr. Beck

6    testified that the renal flow study "tells you more or less what the contribution to the total kidney

7    function each kidney represents.  For example, in a situation where the cancer was in the best

8    kidney . . . then you have to be very judicious about what you want to do."  (Id. at 61.)

9    37.  On November 13, 2009, plaintiff saw Dr. Reddy and agreed to undergo further testing

10   prior to surgery.  (ECF No. 119-1 at 38 (Reddy Exh. N); ECF No. 110 at 5 (Beck Exh.).)  On the

11   same date, Dr. Reddy completed a Form 7234, requesting that plaintiff obtain both a "Nuclear

12   Med Scan – Differential Renal Function," and "Bone Scan – full body."  (ECF No. 119-1 at 40

13   (Reddy Exh. O).)  Dr. Reddy noted plaintiff's diagnosis as "L kidney mass–malignancy," and

14   explained that the procedures were recommended by Dr. Beck prior to surgery, based on

15   plaintiff's "history of cancer L kidney per urology – awaiting nephrectomy."  (Id.)  At her

16   deposition, Dr. Reddy stated that she wrote "history" of renal cancer," rather than "suggestive,"

17   because it was the terminology that had been used in other reports concerning plaintiff's

18   diagnosis.  (Reddy Depo. (ECF No. 140 at 175-81).)

19   38.  These procedures were approved on November 17, 2009, by FSP's Medical

20   Authorization Review Committee (MARC).  (ECF No. 119-1 at 40.)  Dr. Reddy testified that,

21   when an outside medical consultant recommends a treatment plan that is outside the scope of

22   medical care provided by FSP, the plan must go through the MARC process for approval.

23   (Reddy Depo. (ECF No. 140 at 203).)

24   39.  Dr. Reddy's treatment notes for plaintiff on December 2, 2009, provide:  "Pt. here to

25   chk BP + F/U L Kidney mass – cancer – awaiting nephrectomy @ DHM Dr. Beck.  Pt. had bone

26   scan last week.  Pt. awaiting renal flow nuclear med. scan + eval. by Dr. Beck prior to scheduling

27   surgery @ DHM.  Pt. denies abd pain. . . . Will obtain scan reports & D/W DHM for surg. appt.

28   date per Dr. Beck."  (ECF No. 110 at 4 (Beck Exhs.).)

40.  Plaintiff's whole-body bone scan, conducted November 23, 2009, was "not suggestive of metastic disease." (ECF No. 119-1 at 42 (Reddy Exh. P).)  Dr. Reddy testified that she reviewed this report on December 2, 2009. (Reddy Depo. (ECF No. 140 at 183, 193).) Her treatment notes dated December 7, 2009, state in pertinent part:  "Bone scan – (-) [negative] for mets. . . . Awaiting renal differential scan . . . ." (ECF No. 110 at 3 (Beck Exhs.).)

41.  Plaintiff's renal flow study and renogram, conducted December 9, 2009, showed that plaintiff's "kidney function is decreased on both sides," specifically, that "the left-sided [kidney] contributes 46% and the right-sided 54% to the total function." (ECF No. 119-1 at 44 (Reddy Exh. Q).)  The scan showed no obstructions.  (Id.)

42.  Dr. Reddy's treatment notes for plaintiff on December 14, 2009, indicate that Dr. Reddy reviewed with plaintiff the results of both his renal flow study and bone scan, and that they were waiting for Dr. Beck to review the tests and schedule the surgery. (ECF No. 110 at 1 (Beck Exhs.).)  Dr. Reddy noted that "Pt. voiced understanding of plan + agreed in his own words." (Id.)

43.  Dr. Reddy saw plaintiff on December 21, 2009, prior to his pre-op appointment with Dr. Beck, and noted that plaintiff had no new complaints, that he was "[f]eeling good," and that she would follow-up with plaintiff after the appointment. (ECF No. 109-1 at 14 (Beck Exhs.).)

44.  On December 21, 2009, plaintiff had his pre-op appointment with Dr. Beck.  Dr. Beck's report noted the bone scan and renal flow test results, and that plaintiff's chest x-ray was negative. (ECF No. 119-1 at 48-9.)  Dr. Beck recounted plaintiff's medical history and the results of Dr. Beck's physical examination.  Dr. Beck concluded in pertinent part (id.) (emphasis added):

> This patient has a CT scan which showed a 2.9 x 2.5 cm hypodense mass in the upper pole of the *right* kidney.  He is asymptomatic and has no pain, nausea, or vomiting, chills or fever, hiccups, or hematuria.  CT scan in April 2009 showed *left* renal mass subsequent to x rays at Mercy Hospital in Folsom showed a *right* renal mass.  I do not have these films so I *am not sure which side it is on at this point*.
>
> His nuclear medicine scan shows left side contributes 46% percent and the right side 54% of total renal function.  CT scan shows no evidence of metastasis and bone scan is negative.
>
> He has apparently had a chest x ray which is negative. . . .

17

1
2
3
4

> Impression/ Plan:  Kidney cancer.  *I am not sure which side it is on at this point; probably the right.*  We will get the films and assess the laterality, and schedule him for laparoscopic hand-assisted radical nephrectomy.
>
> He was counseled about the operation including risks, possible complications versus benefits and he agrees. . . .

5

6

45.  Dr. Beck explained his confusion concerning the location of plaintiff's renal mass (Beck Depo. at 73 (ECF No. 107-1 at 4)):

7
8
9
10
11

> We have two different – at this visit, as far as I recall, did not have the x-rays from either the April or the August, I believe it was, scans.  But I had the reports, one says right and one says left.  I'm not sure which of those two, which of those two scans I saw when I first saw the patient.  I testified that I thought it was the August, but it might have been April.  I don't remember for sure.  Nevertheless, the lesion was there on both scans so I was confused because of the two reports and having not seen the patient for a while.  And what I say is I'm going to get the scan and decide.

12

13

14

15

16

17

18

19

20

21

46.  Dr. Beck testified that neither the bone scan nor the renal flow study were diagnostic for detecting kidney cancer.  He testified that the renal flow study "doesn't speak to the renal cell carcinoma aspect at all.  It's unusual to see anything on these studies in regard to masses in the kidney.  That's not why I ordered it.  Why I ordered it was to see what his differential function was."  (Beck Depo. at 63 (ECF No. 107-1 at 2).)  Similarly, Dr. Beck testified that the bone scan is not a diagnostic procedure for renal cell carcinoma; he ordered it to check for metastases.  (Id. at 64.)  Dr. Beck testified that, although he told plaintiff on November 10, 2009 that he wasn't sure whether plaintiff had cancer, he did not pursue further diagnostic tests or procedures.  (Id. at 65-9, 81.)  All remaining tests that were conducted – lab work, blood work, EKG – were "normal pre-operative stuff we do."  (Id. at 67-8, 74.)

22

23

24

25

26

47.  Dr. Beck testified that he "did consider other things [diagnostic procedures] but I don't recall that I told [plaintiff] that."  (Id. at 65.)  Dr. Beck said that he considered a biopsy and MRI "but in my opinion with this patient and his circumstances as a prisoner with limited access to care, I did what I thought was appropriate for him."  (Id. at 66.)  Dr. Beck explained (id. at 108-09):

27

28

> I thought that in his circumstances where he could be transferred quickly from one place to another, when he gets to the next place he doesn't have access to a doctor for sometimes months at a time,

> where he may or may not have adequate imaging available to him, that the most expeditious, safest treatment for this particular patient, in this particular situation[,] was what we did.  I have seen patients in that situation where treatment that was started and six months later they're at a different facility and treatment still hasn't been done and now they have a problem. . . .

48.  Dr. Beck testified that he didn't conduct a biopsy for the following reasons (id. at 66-7):

> [T]his lesion was high up in the kidney and fraught with the hazards of pneumothorax, injury to the spleen, bleeding, infection, possibly spreading tumor and then the limitations of the diagnostic procedure itself. . . . I've had biopsies where they don't know what that is.  There's tissue.  It doesn't look like cancer.  They're not sure and then you operate and it's cancer.  I mean it's not a very accurate way of diagnosing it.  It can be done but he's a prisoner patient, remember.  He does not have – I don't have the ability to bring him immediately into the emergency room if he starts having a pneumothorax, hemothorax, injured spleen.  If he's bleeding out inside of him, he could die in prison from this procedure so, no, not appropriate for him.

49.  Dr. Beck testified that he "didn't know" if an MRI would have disclosed whether plaintiff's kidney mass was cancerous.  He explained, "Well, I normally don't get MRIs on these. CT scan is just as informative as an MRI usually."  (Id. at 67.)  Dr. Beck stated, "there's only one test . . . that would have definitively told us he had renal cell carcinoma and that was take out his kidney. . . and I explained that to him."  (Id. at 69.)

50.  It is unclear from his testimony whether Dr. Beck reviewed the reports and/or actual images of plaintiff's April 22, 2009 CT scan, and April 3, 2009 ultrasound, prior to plaintiff's first appointment and/or surgery.  (Id. at 73-4, 117-19.)

51.  On December 21, 2009, when plaintiff returned to FSP from his pre-op appointment with Dr. Beck, plaintiff told the admitting nurse, Edward Pineda, that "he was told he will be scheduled for kidney removal.  States further, he will go for the surgery since he can live with only one kidney. . . . Willingness for surgery shown by his facial expression. . . ."  (ECF No. 109-1 at 15 (Beck Exhs.).)

52.  Dr. Reddy's treatment notes for plaintiff on January 4, 2010, noted that plaintiff was awaiting a nephrectomy, following his December 21, 2009 pre-op appointment.  She noted that

1    "Pt. voiced understanding of plan + agreed in his own words."  (ECF No. 109-1 at 13 (Beck

2    Exhs.).)

3           53.  On January 6, 2010, plaintiff's left kidney was removed at Doctors Medical

4    Center of Modesto, by Defendant Dr. Beck and his assistant, Dr. Liu.  (SAC ¶ 23; Exh. F.)

5           54.  Dr. Beck testified that, on January 6, 2010, just prior to plaintiff's surgery, he

6    explained to plaintiff that his lesion may not be cancerous, "[t]hat it could be a benign lesion such

7    as a cyst or there's even solid tumors that are benign, although very rare, but that's the only way

8    to find out for sure it to take his kidney out."  (Beck Depo. at 84 (ECF No. 107-1 at 7).)  Dr. Beck

9    testified that plaintiff responded, "if there's a possibility that it's cancer I want it taken care of or

10   some words to that effect."  (Id.)

11          55.  Upon review of the excised kidney on January 6, 2010, pathologist Dr. Cui made the

12   following diagnosis (ECF No. 127 at 109-10 (Pltf. Exh. G); ECF No. 140 at 145-46 (Pltf. Exh. G)

13   (ECF No. 113 AT 1-2 (Beck Exhs.):

14                  Left kidney, left radical nephrectomy:
                    - Benign kidney with multiocular cyst.
15                  - No evidence of renal cell carcinoma.
                    - Scattered minimal chronic inflammation.
16

17          56.  Plaintiff testified that, after the surgery, he was "[t]ore up. . . . traumatized . . .

18   physically beat."  (Pltf. Depo. (ECF No. 140 at 102).)  Plaintiff returned to FSP on January 11,

19   2010; his readmission notes indicate that he requested, and received, pain medication.  (ECF No.

20   109-1 at 12 (Beck Exhs.).)

21          57.  On January 20, 2010, Dr. Beck informed plaintiff that the kidney he had removed

22   was cancer-free, and that the mass seen on the original CT scan was a benign cyst.  As framed in

23   the SAC, "[w]hen Plaintiff expressed frustration . . . Defendant Beck, M.D. callously replied,

24   'You've been notified.'"  (SAC ¶ 25 (and Exh. H).)  Plaintiff testified that, when Dr. Beck told

25   him the kidney he removed was cancer-free, he stated, "'You've been notified,' and that was it."

26   (Pltf. Depo. (ECF No. 140 at 60).)  Plaintiff testified that he asked Dr. Beck why he hadn't done a

27   biopsy first, as plaintiff had requested in March or April.  (Id. at 106-07.)  Plaintiff testified that

28   he "went off" on Dr. Beck and was then locked up in "the cage" at FSP for three hours.  (Id. at

1  60-1, 105-08.)  Plaintiff testified in December 2013 that he hasn't seen Dr. Beck since.  (Id. at

2  61.)

3  58.  Dr. Beck testified that he told plaintiff that he was "very fortunate it wasn't cancer.  It

4  was a cyst, a multiocular cyst.  They sometimes look like cancer.  That's what it looked like but

5  you don't have cancer and that's important because we don't have to worry about it from now

6  on." (Beck Depo. at 103 (ECF No. 107-1 at 12).)  Dr. Beck testified that he did not recall if

7  plaintiff said anything to him after receiving this news, but "looked somewhat puzzled I would

8  say."  (Id.)

9  59.  Beck's notes following the appointment provide in full (ECF No. 109 at 12; Beck

10  Depo. at 103-04 (ECF No. 107-1 at 12)):

11  Status post LT nephrectomy.  The mass is a multiocular cyst, not
     CA.  He was informed.

12

13  Check GFR [glomerular filtration rate], creatinine regularly.  Avoid
     nephron-toxic meds.  Daily protein intake normal.

14  Dr. Beck testified that this information was for the prison medical staff, and he did not discuss

15  these matters with plaintiff, except maybe advising him to keep his protein intake low.  (Beck

16  Depo. at 105.)

17  60.  When plaintiff returned to FSP on December 21, 2009, following his post-surgical

18  appointment with Dr. Beck, the admitting nurse, V. Tucker, noted that plaintiff made the

19  following statements (ECF No. 109-1 at 7 (Beck Exhs.)): :

20  P/I stated, 'I was told in November 2009 that I had Cancer of my
     Left Kidney.  I was told that I need to have my Left Kidney
21  removed d/t the Cancer.  I was told today that I did not have cancer
     although my left kidney was removed.  I am going to tell my people
22  and get my attorney.  Dr. Reddy only read the report, so it's not her
     fault.  The people who did the diagnostic test and surgery is the one
23  to blame.'  P/I verbalized his feelings and was able to vent to
     medical staff.  Emotional support was given and P/I was pleased.
24

25  61.  Dr. Reddy testified that she did not recall whether she saw plaintiff as a patient after

26  he had his kidney removed.  (Reddy Depo. (ECF No. 140 at 187).)  Plaintiff testified that he

27  recalls seeing Dr. Reddy during the week of January 20, and "went off on her too," and told her

28  he didn't want to see her anymore, although he did see her once more, about a month later, and

1   reiterated his feelings.  (Pltf. Depo. (ECF No. 109 at 108-12).)

2       62.  On January 15, 2010, Dr. Reddy discussed the surgery results with plaintiff, and

3   requested a urology follow-up appointment.  (ECF No. 109-1 at 8 (Beck Exhs.).)

4       63.  On January 21, 2010, Dr. Reddy entered the following treatment notes (id. at 6):

5           Pt. refused to go to Nephro appt . . . pt. is angry with all the doctors
            and do[es] not want to see or talk to anyone anymore – since he was
6           not diagnosed with cancer kidney (sic) on path report + his L
            kidney was removed thinking it was cancer per CT scan abd +
7           urology at DHM Dr. Beck.  Pt. was at urology F/U yest at DHM +
            was told that the path report did not show renal cell Ca – it showed
8           multiocular cysts on L kidney.  I tried calling R+R to convince pt. +
            encourage him to go to his nephro appt., but pt. refused.  I asked
9           Bdlg RN – Jasmine – to talk to pt. in R&R – but pt. refuses to go to
            Nephro appt. + do[es] not want to listen to talk to anyone.  Pt.
10          angry.

11      64.  On January 29, 2010, Dr. Reddy noted that plaintiff had refused routine medical care,

12  lab work, and specialty care, and stated that plaintiff "does not want to talk to medical."  (Id. at

13  4.)

14      65.  It appears that, on February 12, 2010, plaintiff had a regular follow-up appointment

15  with Dr. Reddy, and agreed to see a nephrology expert.  (Id. at 3.)

16      66.  Meanwhile, apparently on January 22, 2010, Dr. Reddy noted that she had been

17  informed that plaintiff would be transferred to California State Prison-Corcoran, because it could

18  better provide for plaintiff's medical needs.  (Id. at 5.)

19      67.  On April 28, 2010, plaintiff submitted an inmate Health Care Services Request (Form

20  7362), requesting mental health care.  He stated in full (ECF No. 140 at 235 (Pltf. Exh. J); ECF

21  No. 127 at 112 (Pltf. Exh. H)):

22          "My 4th time.  Don't want to see Holland – TPSD [PTSD?] –
            Having flashback can't sleep.  Don't trust Drs. here or C.O.  My
23          family is very upset about my surgery.  I am in pain, do (sic) to
            surgery – never had any before.
24

25      68.  Plaintiff contends in his SAC: "Since Plaintiff's left nephrectomy, Plaintiff has and

26  continues to suffer physical pain and mental anguish.  Plaintiff has been forced to alter his

27  lifestyle, including his diet and exercise regime, because he now has only one kidney." (SAC ¶

28  26.)  Plaintiff testified that he has hypertension, takes blood pressure medications, and is on a

                                        22

special diet.  (Pltf. Depo. (ECF No. 140 at 63-46.)  He testified that his kidney function is "up and down," and that he checks in regularly with a kidney specialist through Telemed.  (Id. at 64-8.) Plaintiff testified that he was ordered a special diet in 2010, by a kidney specialist at Napa Hospital (Dr. Gunnel) (to control his creatinine, sodium, sugar, and water intake), but "I never received a special diet until I went to Corcoran, almost 16 months later. . . . Folsom didn't.  CMC didn't.  Only Corcoran and here."  (Id. at 69-70.)  Plaintiff testified that, since the surgery, he has had to rely on the assistance of a cane to walk, due to sciatic pain, on "the left side, where the kidney was removed."  (Id. at 56, 55-8.)  Plaintiff tries to walk in the yard three or four times a week, and tries to do pushups, back and arm curls.  (Id. at 71-2.)

69.  Recent medical records dated May 28, 2013, note in pertinent part that plaintiff has "chronic kidney disease stage 3 because of high blood pressure.  He has only 1 kidney.  The other one was removed because of possible cancer, but it turned out not to be cancer at all. . . ."  (ECF No. 109 at 13-15.)  Plaintiff is in the Disability Placement Program due to Mobility Impaired Lower Extremities, and uses a cane for ambulation.  (Id. at 13.)  Plaintiff suffers from, inter alia, "lower back pain/degenerative joint disease," with MRI findings of "L5-S1 spondylolisthesis, bilateral L5 spondylolysis, [and] moderate spinal stenosis L3, L5."  (Id. at 13-4.)

V. Dr. Paramvir Sahota, FSP Chief Physician and Surgeon, Deposition Testimony

Plaintiff has submitted selected portions of the transcript from his counsel's deposition of Dr. Sahota.  (Sahota Depo. (ECF No. 140 at 205-233).)  Dr. Sahota was FSP's Chief Physician and Surgeon during the relevant period (Feb. 2008-Jan. 2013) (id. at 209), and supervised Dr. Reddy (id. at 230).  During this period, Dr. Sahota's responsibilities included reviewing first and second-level inmate grievances, and participating in MARC meetings, which he described as meetings of FSP's physicians and nurse practitioners for the purpose of deciding whether clinical or medical necessity supported referring an inmate for outside medical care.  Dr. Sahota testified that the usual procedure is for the inmate's primary care physician to make an oral presentation in support of the requested care, and for all providers to review the inmate's medical record, which would include the reports of any consulting physicians.  (Id. at 213-19.)

////

23

1        Dr. Sahota testified that plaintiff's referral to an outside urologist, and related surgery,

2   would need to be approved by the MARC.[4]  (Id. at 218, 231-32.)

3        Dr. Sahota acknowledged that he signed the First Level Review of plaintiff's adminis-

4   trative grievance challenging his health care (Log No. FSP -26-10-10119).[5]  (Id. at 221-26.)

5   V.  Dr. Shankari Reddy, Plaintiff's Objections to Declaration

6        Plaintiff moves to strike the entire declaration of defendant Dr. Reddy, pursuant to Federal

7   Rule of Evidence 702,[6] on the ground that it is cumulative of her deposition testimony and "will

8   [not] help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R.

9   Evid. 702(a).  Dr. Reddy responds that, as a defendant in this action, she has every right to submit

10  

11  [4]     However, it appears that the only MARC-approved evidence in the record is the Form

12  7234 request submitted by Dr. Reddy on November 13, 2009, for a "Nuclear Med Scan –
    Differential Renal Function," and "Bone Scan – full body."  (ECF No. 119-1 at 40 (Reddy Exh.

13  O)); Dr. Reddy noted thereon that plaintiff was diagnosed with "L kidney mass–malignancy," and
    that the procedures were pre-surgical screenings ordered by Dr. Beck prior to plaintiff's

14  nephrectomy; the request was approved by MARC on November 17, 2009.

15  [5]     Dr. Sahota testified that he did not specifically recall this decision; that it was likely

16  prepared by the litigation coordinator for his review; but that it is clear from his signature that he
    reviewed and approved the proposed decision.  (Sahota Depo. (ECF No. 140 at 225-26).)  Dr.

17  Sahota noted that he denied plaintiff's appeal on the ground that his request for a Medical Board
    investigation was outside the authority of CDCR, but he acknowledged that the Second Level

18  Review decision cited his First Level Review decision as a basis for denying plaintiff's challenge
    to the alleged "action of misdiagnosis . . . of cancer that placed [him] at risk for surgery with Dr.

19  Beck in order to remove a cancer free kidney."  (Id. at 226-28.)

20  [6]     Federal Rule of Evidence 702 provides:

21
            A witness who is qualified as an expert by knowledge, skill,
22          experience, training, or education may testify in the form of an
            opinion or otherwise if:

23          (a) the expert's scientific, technical, or other specialized knowledge
24          will help the trier of fact to understand the evidence or to determine
            a fact in issue;

25          (b) the testimony is based on sufficient facts or data;

26          (c) the testimony is the product of reliable principles and methods;
            and
27

28          (d) the expert has reliably applied the principles and methods to the
            facts of the case.

1    her own declaration in support of her motion for summary judgment, particularly to address "the

2    standard of care of primary care physicians and their obligation under that standard of care, which

3    is to refer patients to a specialist when the medical condition of the patient is outside the scope of

4    the primary care physician's expertise."  (ECF No. 142-3 at 2.)

5           Review of Dr. Reddy's declaration shows that the majority of it identifies and summarizes

6    plaintiff's pertinent medical treatment.  It is not cumulative of her deposition testimony.  Rather,

7    this information, like that provided by the parties' medical experts, summarizes pertinent facts

8    about plaintiff's medical care that have been incorporated herein as Undisputed Facts.  The court

9    has relied on these summaries to ensure that all pertinent medical evidence is considered in

10   addressing the pending motions; the court has relied on Dr. Reddy's declaration for nothing more.

11   For this reason, plaintiff's objection as to Dr. Reddy's entire declaration is overruled.

12          Plaintiff moves, alternatively, to strike Paragraphs 23-25 of Dr. Reddy's declaration,

13   wherein she opines that her treatment of plaintiff met the standard of care for family practitioners.

14   Plaintiff asserts that Dr. Reddy's opinion lacks foundation because it cannot be relied upon to

15   determine whether she in fact met the standard of care, which is dependent on the assessment of

16   expert opinions, not the assessment of a medical defendant.  "Because the standard of care in a

17   medical malpractice case is a matter peculiarly within the knowledge of experts, expert testimony

18   is required to prove or disprove that the defendant performed in accordance with the standard of

19   care unless the negligence is obvious to a layperson."  Johnson v. Superior Court, 143 Cal. App.

20   4th 297, 305 (2006) (citations, quotation marks and punctuation omitted).  The court agrees.

21          For this reason, plaintiff's objections to Paragraphs 23-25 of Dr. Reddy's declaration

22   (ECF No. 119-2), are sustained.  The following statements set forth in Dr. Reddy's declaration, in

23   which she asserts that her medical treatment of plaintiff met the standard of care, are disregarded:

24                 (1)  "As a primary care provider, the standard of care for Mr. Elliott
                   was provided within the scope of my practice and was also based
25                 upon the recommendations of specialist physicians."  (Reddy Decl.,
                   ¶ 24, sentence 4.)
26
                   (2) "I acted within the standard of care as a primary care physician
27                 at all times regarding Mr. Elliott's medical treatment."  (Reddy
                   Decl., ¶ 24, sentence 1.)
28

(3) "At no time was I deliberately indifferent to Mr. Elliot's medical needs." (Reddy Decl. ¶ 25, first portion of second sentence.)

## VI. Expert Medical Opinions – Objections and Substance

### A. Dr. Marc Dall'Era, M.D., Expert Witness for Plaintiff

Plaintiff has submitted the same declaration of Dr. Dall'Era in support of plaintiff's opposition to both pending motions for summary judgment.  (See ECF Nos. 128, 135.)

#### 1. Dr. Beck's Objections

Dr. Beck objects to Dr. Dall'Era's declaration on the ground that it lacks foundation, and should therefore be stricken pursuant to Federal Rules of Evidence 702 and 703.[7]  Dr. Beck asserts that the challenged declaration "does not indicate that Dr. Dall'Era reviewed or was even aware of the existence of the August 25, 2009 CT scan, or the report of this diagnostic film." (ECF No. 144 at 1.)  This allegation is inaccurate.  Dr. Dall'Era notes in pertinent part that the Bosniak Category 2F cyst identified pursuant to plaintiff's April 3, 2009 CT scan, "was later not recognized on a renal ultrasound on April 22, 2009, but then was found to be unchanged on a CT scan taken on August 25, 2009."  (Dall'Era Decl. ¶ 10.)

In his further, related, objection, Dr. Beck asserts that "[t]he medical records indicate that the kidney mass was not identified as a cyst until after the surgery," and, therefore, the April 3, 2009 CT scan (finding a Bosniak Category 2F lesion that "may represent a hemorrhagic cyst"), which is at the heart of Dr. Dall'Era's opinion, is "not relevant" and "not supported by admissible evidence."  (ECF No. 144 at 2.)  Dr. Beck appears to argue that, had Dr. Dall'Era been aware of plaintiff's August 25, 2009 CT scan (which identified a hypodense mass without "the

[7]    Federal Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

1  characteristics of a simple cyst"), he would have realized that the April 3, 2009 Bosniak

2  classification was both premature and inaccurate.  However, this inconsistency in the reports of

3  plaintiff's scans does not necessarily render one more valid than the other.  Moreover, as

4  recounted below, Dr. Dall'Era opined that plaintiff's kidney lesion was a cyst based on his own

5  review of the actual images of plaintiff's February 27, 2009 CT scan.  Finally, as defendant

6  concedes, the January 2010 post-surgical biopsy of plaintiff's kidney (finding a "multiocular

7  cyst") was more consistent with the findings of his April 2009 CT scan, than with his August

8  2009 CT scan.

9       For these reasons, Dr. Beck's objections to the expert medical opinion of Dr. Dall'Era are

10 overruled.

11       2.  Expert Opinion of Dr. Dall'Era

12       Significantly, Dr. Dall'Era's declaration, submitted in opposition to the motions for

13 summary judgment filed by both Dr. Beck (ECF No. 128), and Dr. Reddy (ECF No. 135),

14 addresses only the care provided by Dr. Beck.

15       Dr. Dall'Era is a board certified urologist licensed to practice medicine in California.

16 Since 2010, he has been the Medical Director of the Urology Clinic at the University of

17 California, Davis, School of Medicine.

18       Dr. Dall'Era reviewed plaintiff's medical records and reports, and the actual images of

19 plaintiff's February 27, 2009 Triphasic CT Scan, and plaintiff's April 22, 2009 ultrasound.  Dr.

20 Dall'Era also reviewed the depositions of plaintiff and Dr. Beck.

21       Dr. Dall'Era initially states that plaintiff "presented with a lesion in his left kidney noted

22 on a CT scan performed on February 27, 2009.  A follow-up CT scan on April 3, 2009, describes

23 a slightly dense, minimally enhancing lesion categorized as a Bosniak Category 2F cyst.  This

24 cyst was later not recognized on a renal ultrasound on April 22, 2009, but then was found to be

25 unchanged on a CT scan taken on August 25, 2009."  (Dall'Era Decl. ¶ 10.)

26       Dr. Dall'Era recounts that his "review of the actual CT images from February 27, 2009,

27 shows a three (3) centimeter ('cm') round, homogeneous lesion in the upper pole of the (sic) Mr.

28 Elliot's left kidney that demonstrates a density of 7.38 Hounsfield units ('HU') before IV contrast

1    and 9.6 HU after administration of IV contrast."  (Dall'Era Decl. ¶ 11.)  Dr. Dall'Era opines that

2    "[t]his is consistent with a non-enhancing cyst as significant enhancement is typically considered

3    greater than twenty (20) HU change after the administration of IV contrast.  Mr. Elliot's kidney

4    lesion had no renal vein involvement and no lymphadenopathy.  These findings suggest a less

5    than five percent (5%) risk of malignancy.  The standard of care for a lesion of this nature is to

6    follow and monitor the lesion with repeat imaging to ensure no changes occur over time."  (Id.)

7         Dr. Dall'Era explains that "[a] Bosniak 1 cyst is essentially a simply (sic) cyst with no risk

8    of malignancy.  A Bosniak 2 cyst has some complex features such as increased density,

9    septations, or calcifications; however, there is no enhancement with contrast.  A Bosniak 2 cyst

10   has a less than 5 percent (5%) risk of malignancy, which is consistent with the lesion that was in

11   Mr. Elliot's kidney, which appeared minimally complex.  A Bosniak 2F (F for follow) cyst has

12   complexity to it for which surveillance is recommended to ensure stability.  The standard of care

13   for such a lesion is surveillance, with the majority of these cysts never requiring surgical

14   intervention.  Further characterization with magnetic resonance imaging ('MRI') may also

15   provide further information regarding such a minimally complex cyst."  (Dall'Era Decl. ¶ 14.)

16   "Bosniak 3 cysts have clear evidence of enhancement and have approximately fifty percent (50%)

17   risk of malignancy.  Bosniak 3 and 4 lesions are typically recommended for surgical intervention.

18   (Id., ¶ 15.)

19        Dr. Dall'Era notes that Dr. Beck concluded with 95 percent certainty that plaintiff had

20   renal cell carcinoma, and recommended a nephrectomy, without "order[ing] any additional

21   diagnostic procedures to confirm his diagnosis . . . and did not advise Mr. Elliot that the proper

22   course of treatment for his Bosniak 2 cyst is surveillance, the majority of these cysts never require

23   surgical intervention, and these cysts generally have less than a five percent (5%) risk of

24   malignancy."  (Dall'Era Decl. ¶ 16.)

25        In conclusion, Dr. Dall'Era opines (Dall'Era Decl. ¶¶ 17-9):

26              It is my opinion that Phillip Beck, M.D., did not exercise
               reasonable medical judgment and did not meet the standard of care
27              in his care and treatment of Robert Elliot. . . .

28              It is my opinion that Dr. Beck's ninety-five percent (95%) certain

                                     28

diagnosis of renal cell carcinoma ignores the clear medical evidence demonstrating exactly the opposite diagnosis for Mr. Elliot.  My opinions are based on my review of the medical records and actual CT scan images in this case.  I conclude that (1) there is no doubt that a kidney mass was identified in Mr. Elliot's left kidney; (2) the CT scan dated February 27, 2009, shows a lesion in Mr. Elliot's kidney that demonstrates a density of 7.38 HU before IV contrast and 9.6 HU after administrative of IV contrast; (3) the CT scan dated April 3, 2009, shows a mildly hyperdense mass within the upper pole of Mr. Elliot's left kidney that demonstrates a density of 41-42 HU before IV contrast and 44 HU after administration of IV contrast; (4) these CT scan results are consistent with a non-enhancing[,] dense, cyst as significant enhancement is typically considered greater than twenty (20) HU change after the administration of IV contrast; and (5) the proper course of treatment for Mr. Elliot's Bosniak 2 cyst is surveillance as the majority of these cysts never require surgical intervention and these cysts generally have less than a five percent (5%) risk of malignancy.

It is my opinion that if Dr. Beck reviewed the applicable CT scans and medical reports prior to performing the nephrectomy on Mr. Elliot, his treatment of Mr. Elliot was so substantially outside the standard of care and opposite of reasonable medical judgment, that Dr. Beck would have needed to disregard the substantial body of medical evidence at his disposal to come to his diagnosis and treatment plan for Mr. Elliot.

B.  <u>Dr. Rodney Anderson, M.D., Expert Witness for Dr. Beck</u>

Defendant Dr. Beck has submitted the declaration of Dr. Rodney Anderson in support of his motion for summary judgment.  (<u>See</u> ECF No. 106-1 at 5-12.)

1.  <u>Plaintiff's Objections</u>[8]

Plaintiff objects to Dr. Anderson's declaration because it allegedly lacks foundation and is cumulative of Dr. Beck's deposition testimony.  Plaintiff moves to strike paragraphs 5 and 24-30 of Dr. Anderson's declaration, pursuant to Federal Rules of Evidence 702 and 703.

Plaintiff asserts two grounds for striking Dr. Anderson's declaration for lack of foundation, specifically, that "Dr. Anderson does not indicate he reviewed any actual CT scan images taken of Mr. Elliot. . . . [and] has not reviewed Mr. Elliot's deposition testimony in this case." (ECF No. 129 at 2.)  In reply, Dr. Beck does not address whether Dr. Anderson reviewed Mr. Elliot's deposition testimony (implicitly conceding the point), but asserts that Dr. Anderson

---

[8]   Plaintiff's objections to the declaration of Dr. Anderson are set forth in ECF No. 129; Dr. Beck's replies are set forth in ECF No. 145 and ECF No. 143 at 8.

1    "clearly states that he personally reviewed the CT "scans" or "scan" in this case (ECF No. 145 at

2    1; ECF No. 143 at 8).

3         Dr. Anderson's failure to review plaintiff's deposition testimony does not undermine the

4    foundation of his expert medical opinion, but may go to its weight.  Having reviewed plaintiff's

5    deposition testimony, the court finds that Dr. Anderson's lack of knowledge of plaintiff's

6    testimony did not materially impact his expert assessment whether Dr. Beck acted within the

7    standard of care in providing medical treatment to plaintiff.

8         Next, contrary to plaintiff's objection, Dr. Anderson's declaration clearly states that he

9    "reviewed the records and CT scan [singular] in this case."  (Anderson Decl. at 6 (ECF No. 106-1

10   at 10), ¶ 24, lines 2-3.)  However, Dr. Anderson's declaration does not identify which CT scan

11   images he reviewed.  Nevertheless, Dr. Anderson states that he reviewed all of plaintiff's

12   pertinent medical records, and the deposition of Dr. Beck.  (Id. at ¶¶ 5, 24.)  This review is

13   sufficient information upon which to form an expert medical opinion, Fed. R. Evid. 702(b), and is

14   the type of information reasonably relied upon by a medical expert in forming such opinion, Fed.

15   R. Evid. 703.  "Expert opinion testimony is relevant if the knowledge underlying it has a valid

16   connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable

17   basis in the knowledge and experience of the relevant discipline."  U.S. v. Sandoval-Mendoza,

18   472 F.3d 645, 654 (9th Cir. 2006) (citations and internal quotation and punctuation marks

19   omitted).  While the nature and scope of the information Dr. Anderson relied upon in reaching his

20   expert opinion may impact the weight ultimately accorded his opinion, such information remains

21   an adequate foundation.  See, e.g., Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010) ("When

22   an expert meets the threshold established by Rule 702 . . . the expert may testify and the jury

23   decides how much weight to give that testimony.").

24        For these reasons, plaintiff's objections to the opinion of Dr. Anderson, on foundation

25   grounds, are overruled.

26        Plaintiff also objects to the opinion of Dr. Anderson on the ground that it is allegedly

27   cumulative of Dr. Beck's deposition testimony.  However, this is not the case.  Dr. Anderson's

28   opinion reflects his expert assessment whether Dr. Beck met the standard of care in treating

1    plaintiff.  While this assessment includes consideration of Dr. Beck's reasons for pursuing his

2    recommended course of treatment, this consideration is made within the context of plaintiff's

3    medical history and care over time, as well as his surgical outcome.  Plaintiff's objection is

4    overruled.

5          2.  Expert Opinion of Dr. Anderson

6          Dr. Anderson is a board certified urologist licensed to practice medicine in California.

7    Since 1988, he has been a Professor of Urology at Stanford Medical School; from 1976 to 1996,

8    he was the Chief of the Division of Urology, Department of Surgery, at Santa Clara Valley

9    Medical Center; he was President of the Northern California Urological Association from 1993 to

10   1994, and was a member of their board of directors from 1995 to 2001.

11         Dr. Anderson states that he reviewed plaintiff's medical history and Dr. Beck's deposition

12   testimony in preparing his declaration.  (ECF No. 106-1 at 5-12.)  Dr. Anderson opines in

13   pertinent part (Anderson Decl. at ¶¶ 24-28):

14              ¶ 24.  It is my opinion that Phillip Beck, M.D., exercised reasonable
                medical judgment and met the standard of care in his care and
15              treatment of the plaintiff Robert Elliot. . . . [I]t is my opinion that
                Dr. Beck's assessment and treatment plan were reasonable and
16              appropriate. . . . It is my opinion that Dr. Beck's working diagnosis
                of renal cell carcinoma, with recommended treatment by
17              nephrectomy, was appropriate based on (1) the mass being
                identified in three separate CT scans; (2) at least one of the CT
18              scans noting Hounsfield units in the range of 41-42; (3) a renal
                ultrasound being negative for a cyst, which would have otherwise
19              explained the mass; (4) the mass not having shrunk in size, and
                although not having grown, renal cell carcinomas are generally
20              slow growing tumors; and (5) the mass being a solid tumor, which
                are generally assumed to be carcinomas until proven otherwise.
21
                ¶ 25.  . . . It is my opinion that Dr. Beck ordered the appropriate
22              tests prior to surgery.

23              ¶ 26.  . . . It is my opinion that the surgery was indicated and
                appropriate in this case.  The standard of care did not require Dr.
24              Beck to order any additional tests prior to surgery.  There was no
                pre-operative test which could have definitively determined if the
25              kidney mass was cancer or not.

26              ¶ 27.  The surgery was performed within the standard of care. . . .

27   ////

28   ////

31

C. Dr. Randall M. West, D.O., Expert Medical Witness for Dr. Reddy

Defendant Reddy has submitted the declaration of Dr. West in support of her motion for summary judgment.  (See ECF No. 119-3 at 1-4.)

1. Plaintiff's Objections

Plaintiff objects to Dr. West's declaration, pursuant to Federal Rules of Evidence 702 and 703, on the grounds that it lacks foundation and is cumulative of Dr. Reddy's deposition testimony.  (ECF No. 136.)

Plaintiff moves to strike paragraph 5 of Dr. West's declaration, for lack of foundation, on the ground that "Dr. West does not indicate he reviewed Mr. Elliot's deposition transcript." However, as the court has previously found, knowledge of plaintiff's deposition testimony is not essential to an expert witness's assessment whether plaintiff's pertinent medical treatment met the standard of care.  If, as here, the opinion otherwise relies upon information which experts in the field "would reasonably rely on," Fed. R. Evid. 703, then the foundation is adequate; the weight to be accorded the opinion will be determined by the trier of fact.  Therefore, plaintiff's objection for lack of foundation is overruled.

Plaintiff moves to strike paragraph 26 of Dr. West's declaration on the ground that his opinion therein is cumulative of Dr. Reddy's deposition testimony.  However, like the opinion of Dr. Anderson, Dr. West's opinion is based on more information than Dr. Reddy's testimony, including an independent review of plaintiff's medical records.  Plaintiff's objection is therefore overruled.

2. Expert Opinion of Dr. West

Dr. West is board certified by the American Board of Family Practice, and has been licensed to practice medicine in California since 1986.  Dr. West has held numerous associate professorships of medicine throughout the United States, and a full professorship of Family Practice at Touro University of California.

Dr. West reviewed plaintiff's "pertinent medical records from Folsom State Prison, Queen of the Valley Hospital, and Doctors Medical Center of Modesto in connection with the events that led to the removal of his left kidney . . . [and] the deposition transcripts of Dr. Shankari Reddy

32

1    and Dr. Phillip Beck." (West Decl. ¶ 5.)

2          Dr. West notes that plaintiff arrived at FSP in March 2007, with a diagnosis of Refractory

3    Hypertension, for which he was taking "multiple anti-hypertensive medications with poor

4    control." (West Decl. ¶ 6.) Dr. West recounts plaintiff's medical history through January 20,

5    2010, when plaintiff learned from Dr. Beck that his left kidney was cancer-free. (Id. ¶¶ 7-24.)

6    This history notes in pertinent part that, in September 2009, Dr. Reddy made the initial referral

7    for plaintiff to see an outside urologist; in October 2010, after plaintiff agreed to surgery, Dr.

8    Reddy "wrote a referral to the urologist for a left nephrectomy;" and in November 2009, "Dr.

9    Reddy issued a referral for a bone scan and a differential renal function study." (Id. ¶¶ 14-8.)

10         Dr. West concludes as follows (West Decl. at ¶¶ 25-6):

11              ¶ 25.   Throughout this entire duration, the patient was regularly
                followed up in his building at FSP by his primary care provider [Dr.
12              Reddy].

13              ¶ 26.  It is my professional opinion that, as a general practitioner,
                Dr. Shankari Reddy followed the standard of care in referring Mr.
14              Elliot to a subspecialist urologist, in that further diagnosis and
                treatment of a possible renal carcinoma would be outside the scope
15              of a family physician's practice.

16   VII.  Discussion

17         A.  Legal Standards for Deliberate Indifference to Serious Medical Needs

18         "[D]eliberate indifference to serious medical needs of prisoners constitutes the

19   unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true

20   whether the indifference is manifested by prison doctors in their response to the prisoner's needs

21   or by prison guards in intentionally denying or delaying access to medical care or intentionally

22   interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)

23   (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately

24   indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere

25   with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting

26   Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

27         "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

28   further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v.

1  Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v.

2  Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104).  Serious

3  medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find

4  important and worthy of comment or treatment; the presence of a medical condition that

5  significantly affects an individual's daily activities; [and] the existence of chronic and substantial

6  pain." McGuckin, 974 F.2d at 1059-60.

7          To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must

8  demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health

9  or safety; the official must both be aware of the facts from which the inference could be drawn

10  that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v.

11  Brennan, 511 U.S. 825, 837 (1994).

12          "In the Ninth Circuit, the test for deliberate indifference consists of two parts.  First, the

13  plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's

14  condition could result in further significant injury or the unnecessary and wanton infliction of

15  pain.  Second, the plaintiff must show the defendant's response to the need was deliberately

16  indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or failure to

17  respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."

18  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation

19  marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v.

20  CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

21          "The indifference to a prisoner's medical needs must be substantial.  Mere 'indifference,'

22  'negligence,' or 'medical malpractice' will not support this claim.  Even gross negligence is

23  insufficient to establish deliberate indifference to serious medical needs." Lemire, 726 F.3d at

24  1081-82 (internal citations, punctuation and quotation marks omitted); accord, Cano v. Taylor,

25  739 F.3d 1214, 1217 (9th Cir. 2014).  Moreover, "[a] difference of opinion between a physician

26  and the prisoner -- or between medical professionals -- concerning what medical care is

27  appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987

28  (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)).

1      Whether a defendant had requisite knowledge of a substantial risk of harm is a question of

2   fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very

3   fact that the risk was obvious.  The inference of knowledge from an obvious risk has been

4   described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the

5   burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue

6   of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ."

7   Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-

8   43) (internal quotation marks omitted).

9      When the risk is not obvious, the requisite knowledge may still be inferred by evidence

10   showing that the defendant refused to verify underlying facts or declined to confirm inferences

11   that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand, prisons

12   officials may avoid liability by demonstrating "that they did not know of the underlying facts

13   indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or

14   that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts

15   gave rise was insubstantial or nonexistent."  Id. at 844.  Thus, liability may be avoided by

16   presenting evidence that the defendant lacked knowledge of the risk and/or that his response was

17   reasonable in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S.

18   294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

19      B.  Analysis

20      1.  Dr. Beck

21      The opinion of plaintiff's expert, Dr. Dall'Era, supports an inference that Dr. Beck was

22   deliberately indifferent to plaintiff's serious medical needs by hastily diagnosing renal cancer

23   based on limited evidence, then recommending and performing a nephrectomy without

24   conducting further diagnostic tests or procedures.  Dr. Dall'Era opines that Dr. Beck's "treatment

25   of Mr. Elliot was so substantially outside the standard of care and opposite of reasonable medical

26   judgment, that Dr. Beck would have needed to disregard the substantial body of medical evidence

27   at his disposal to come to his diagnosis and treatment plan for Mr. Elliot."  (Dall'Era Decl. ¶ 19.)

28   ////

1    Dr. Dall'Era bases this conclusion on Dr. Beck's apparent failure to consider, at least

2    before his diagnosis, the results of plaintiff's April 3, 2009 CT scan, which identified plaintiff's

3    kidney mass as a "Bosniak Category 2F lesion which . . . may represent a hemorrhagic cyst"

4    (ECF No. 140 at 7-8); the lesion was diagnosed as a multiocular cyst upon removal of plaintiff's

5    kidney.  Dr. Dall'Era states that "the majority of these cysts never require surgical intervention

6    and these cysts generally have less than a five percent (5%) risk of malignancy;" the treatment

7    protocol is surveillance.  (Dall'Era Decl. ¶¶ 11, 14, 16, 18.)  This assessment is consistent with

8    that of the radiologist who reviewed plaintiff's April 3, 2009 CT scan, and opined that "a Bosniak

9    Category 2 F lesion . . . requires follow-up," by ultrasound, "dynamic MRI," and/ or follow-up

10   CT scan.  (ECF No. 140 at 8.)  Dr. Dall'Era observes that plaintiff's February 29, 2009 CT scan

11   (the images of which Dr. Dall'Era reviewed) showed a "minimal enhancement of approximately

12   10%" with contrast (ECF No. 140 at 7 (from 7 HU to 9 HU)), while "significant enhancement is

13   typically considered greater than twenty (20) HU change after the administration of IV contrast."

14   (Dall'Era Decl. ¶ 11.)  Dr. Dall'Era emphasizes that the April 3, 2009 CT scan also showed

15   minimal enhancement with contrast (from 41-42 HU to 44 HU); that no cyst or mass was found

16   pursuant to plaintiff's April 22, 2009 ultrasound; and that the cyst was "found to be unchanged"

17   pursuant to plaintiff's August 25, 2009 CT scan.  (Id. at ¶¶ 10, 16.)  Dr. Dall'Era opines that Dr.

18   Beck improperly recommended and performed the nephrectomy "without "order[ing] any

19   additional diagnostic procedures to confirm his diagnosis . . ." (id. at ¶ 16), including "[f]urther

20   characterization with magnetic resonance imaging ('MRI') [which] may . . . [have] provide[d]

21   further information regarding such a minimally complex cyst" (id. at ¶ 14).

22   Dr. Dall'Era's expert opinion supports a finding that Dr. Beck proceeded with surgery

23   despite "knowing of and disregarding an excessive risk to plaintiff's health," involving the

24   "'unnecessary and wanton infliction of pain."  Farmer v. Brennan, supra, 511 U.S. at 837.  Stated

25   differently, plaintiff has demonstrated triable issues of fact concerning whether Dr. Beck's course

26   of treating plaintiff was "medically unacceptable under the circumstances," and chosen "in

27   conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330,

28   332 (9th Cir. 1996) (citations and internal quotation marks omitted).  Dr. Dall'Era's opinion

1   supports an inference that Dr. Beck knew of the excessive risks to plaintiff because they are

2   obvious to a reasonable urologist, and disregarded those risks by refusing to attempt to confirm

3   his initial diagnosis despite reasonable doubts about its validity.

4         The opinion of Dr. Beck's expert, Dr. Anderson, does not overcome these inferences, and

5   underscores the existence of material factual disputes.  Dr. Anderson's declaration opines no

6   more than that Dr. Beck acted "reasonably," "appropriately," and "within the standard of care."

7   Dr. Anderson opines, contrary to Dr. Dall'Era, that "[t]he standard of care did not require Dr.

8   Beck to order any additional tests prior to surgery.  There was no pre-operative test which could

9   have definitively determined if the kidney mass was cancer or not." (Anderson Decl. at ¶ 26.)

10  Moreover, Dr. Anderson opines that Dr. Beck's diagnosis was reasonable based on the following

11  facts:  "(1) the mass being identified in three separate CT scans; (2) at least one of the CT scans

12  noting Hounsfield units in the range of 41-42; (3) a renal ultrasound being negative for a cyst,

13  which would have otherwise explained the mass; (4) the mass not having shrunk in size, and

14  although not having grown, renal cell carcinomas are generally slow growing tumors; and (5) the

15  mass being a solid tumor, which are generally assumed to be carcinomas until proven otherwise."

16  (Id. at ¶ 24.)  These factors, and Dr. Anderson's overall assessment, appear to rest on the

17  assumption that Dr. Beck reasonably considered plaintiff's kidney mass to be a tumor, not a cyst,

18  in direct contradiction with the opinion of Dr. Dall'Era.  These matters will need to be resolved

19  by the trier of fact.

20        For these reasons, defendant Beck's motion for summary judgment on plaintiff's

21  deliberate indifference claim should be denied.

22        2. Dr. Reddy

23        Plaintiff's expert, Dr. Dall'Era, did not address Dr. Reddy's medical care of plaintiff.  In

24  the absence of contradicting expert evidence, or any remarkable evidence of record to the

25  contrary, the court must rely on the opinion of Dr. Reddy's expert, Dr. West.  Dr. West opines

26  that Dr. Reddy followed the standard of care in referring plaintiff to a urologist, then in deferring

27  to the assessment and recommendation of urologist Dr. Beck.  Dr. West opines that "further

28  diagnosis and treatment of a possible renal carcinoma would be outside the scope of a family

1   physician's [Dr. Reddy's] practice."  (West Decl. ¶ 26.)  The record fails to demonstrate a

2   material factual dispute challenging Dr. West's expert opinion that Dr. Reddy's treatment of

3   plaintiff met the standard of care for a physician with her training and position.  Absent some

4   showing of negligence, plaintiff cannot sustain any reasonable inference that Dr. Reddy's

5   treatment of plaintiff was deliberately indifferent.

6        Moreover, the evidence fails to sustain any reasonable inference that Dr. Reddy's

7   treatment of plaintiff was deliberately indifferent.  It appears that Dr. Reddy made timely and

8   appropriate diagnostic and consultative referrals for plaintiff, first of her own accord, then based

9   on the recommendations of specialist Dr. Beck; and she treated plaintiff on a routine and frequent

10  basis, monitoring his state of health and conveying to him material portions of his test results and

11  Dr. Beck's recommendations.  Moreover, it is reasonable to infer that Dr. Reddy encouraged

12  plaintiff to proceed with surgery with a sincere belief that it was in plaintiff's best interests,

13  because Dr. Reddy did not have the expertise to independently evaluate plaintiff's test results or

14  question Dr. Beck's expert assessment.  There is no evidence to support a finding that Dr. Reddy

15  denied, delayed or intentionally interfered with plaintiff's medical care.  See Estelle, 429 U.S. at

16  104-5.

17       For these reasons, defendant Reddy's motion for summary judgment on plaintiff's

18  deliberate indifference claim should be granted.[9]

19       B.  State Law Claims

20       Plaintiff's remaining claims are premised on state law.  Because the court finds that

21  plaintiff's federal claim should proceed against defendant Beck, the court will retain jurisdiction

22  of plaintiff's state law claims.  A federal district court has "supplemental jurisdiction over all

23  other claims that are so related to claims in the action within such original jurisdiction that they

24  form part of the same case or controversy under Article III of the United States Constitution."  28

25  _____

26  [9]  Dr. Reddy contends, alternatively, that she is entitled to qualified immunity.  The qualified
    immunity analysis involves two inquiries:  whether the facts alleged by plaintiff establish a

27  constitutional violation, and whether the right at issue was clearly established at the time.  Saucier
    v. Katz, 533 U.S. 194, 201 (2001).  Because plaintiff has failed to demonstrate a constitutional

28  violation of his rights by Dr. Reddy, the court need not reach the question of qualified immunity.

1    U.S.C. § 1367(a).  A federal action should proceed on both federal and nonfederal grounds when

2    the claims "derive from a common nucleus of operative fact and are such that a plaintiff would

3    ordinarily be expected to try them in one judicial proceeding."  Finley v. United States, 490 U.S.

4    545, 549 (1989) (internal citations, quotation marks and punctuation omitted).

5         1.  Medical Negligence[10]

6              a.  Dr. Beck

7    Dr. Beck concedes that the record, particularly the opinion of plaintiff's expert medical

8    witness, Dr. Dall'Era, demonstrates triable issues of fact concerning plaintiff's medical

9    negligence claim against him.[11]  (ECF No. 143.)

10   _____

     [10]    The legal standards for assessing a professional medical negligence claim in California are

11   as follows:

12              In any medical malpractice action, the plaintiff must establish: (1)
              the duty of the professional to use such skill, prudence, and

13              diligence as other members of his profession commonly possess
              and exercise; (2) a breach of that duty; (3) a proximate causal

14              connection between the negligent conduct and the resulting injury;
              and (4) actual loss or damage resulting from the professional's

15              negligence.

16   Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999) (internal citations, quotation marks and

17   punctuation omitted).

18   [11]    Beck argued in his motion for summary judgment that he was not medically negligent,

19   relying on the opinion of his medical expert (Dr. Anderson), and stating that the "burden now
     shifts to plaintiff to establish through admissible, competent, expert testimony that there is a

20   triable issue of fact" (citing Cal. Civ. Proc. § 437c(p)(2)).  (ECF No. 106 at 12-5.)  However, in
     his reply (ECF No. 143), Beck does not address plaintiff's medical malpractice claim, asserting

21   that he is entitled to summary adjudication only on plaintiff's first (deliberate indifference) and
     third (Cal. Civ. Code § 52.1) causes of action.  Thus, Beck implicitly concedes that the opinion of

22   plaintiff's medical expert (Dr. Dall'Era) creates triable issues of fact as to his alleged medical

23   negligence.

24   "The standard of care against which the acts of a physician are to be measured is a matter
     peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and

25   can only be proved by their testimony. . . . California courts have incorporated the expert
     evidence requirement into their standard for summary judgment in medical malpractice cases.

26   When a defendant moves for summary judgment and supports his motion with expert declarations
     that his conduct fell within the community standard of care, he is entitled to summary judgment

27   unless the plaintiff comes forward with conflicting expert evidence."  Hanson v. Grode, supra, 76

28   Cal. App. 4th at 606 (internal citations, quotation marks and punctuation omitted).

1    Therefore, Dr. Beck's motion for summary judgment on plaintiff's medical negligence

2    claim should be denied.

3         b. Dr. Reddy

4    As previously noted, the declaration of plaintiff's expert, Dr. Dall'Era, addresses the

5    medical treatment provided only by Dr. Beck; it does not reference Dr. Reddy.  In contrast, Dr.

6    Reddy's medical expert, Dr. West, opines that Dr. Reddy's treatment of plaintiff met the standard

7    of care for a family physician.  Dr. Dall'Era's failure to rebut this expert opinion establishes no

8    triable issue of fact concerning Dr. Reddy's alleged negligence.

9    Therefore, Dr. Reddy's motion for summary judgment on plaintiff's medical negligence

10   claim should be granted.

11        2. California Civil Code Section 52.1

12   Plaintiff seeks damages against both defendants pursuant to his "Bane Act" claim.  The

13   pertinent allegations of the SAC provide (SAC ¶¶ 47-50):

14        ¶ 47.  Defendants interfered with or attempted to interfere with the
             Plaintiff's California constitutional rights[12] by coercing Plaintiff to
15           undergo medical treatment and surgery that was not necessary and
             for an improper purpose.
16

        ¶ 48.  As a direct and proximate result of Defendants' violation of
17           the California Civil Code § . . .  52.1, Plaintiff sustained injuries
             and damages.
18

        ¶ 49.  Plaintiff is informed and believes and on such information
19           and belief alleges that said injuries will result in some permanent
             disability and injury to Plaintiff, all to his general damages in a sum
20           according to proof.

21        ¶ 50.  In addition, the conduct of Defendants . . . was malicious and

22   ────────────────────
     [12]    When ruling on defendant Beck's previous motion to dismiss, the court liberally construed
23   plaintiff's allegations of interference with his "California constitutional rights" (SAC ¶ 47) to
     include the alleged denial of plaintiff's federal constitutional rights, specifically, plaintiff's Eighth
24   Amendment right to be free from deliberate indifference to his serious medical needs.  (See ECF
     No. 95 at 19.)  As the court then noted, as a general rule, a state law claim under Section 52.1
25   incorporates the allegations of a contemporaneously-filed federal constitutional claim under
     Section 1983.  See Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013) (Section 52.1 does not
26   provide substantive protections but a mechanism for seeking damages for violation of civil rights;
     elements of excessive force claim are the same under § 52.1 and § 1983); accord Love v. Salinas,
27   2011 WL 2620453, *7 (E.D. Cal. 2011) (claims are parallel); Sameth v. County of Los Angeles,
     2011 WL 6937275, * 7 (C.D. Cal. 2011) (claims are essentially identical).

28

oppressive and done in conscious disregard for the rights and safety of Plaintiff and his person. As such, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined according to proof at trial.

a. Legal Standards

The "Bane Act," California Civil Code section 52.1, proscribes conduct by any person, "whether or not acting under color of law," who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state. . . ." Cal. Civ. Code § 52.1(a). An action may be brought by the government, id., or by an individual, id. § 52.1(b), in a "civil action for damages, including, but not limited to, damages under Section 52,[13] injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured," id.

"To obtain relief under Civil Code section 52.1, a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion." O'Toole v. Superior Court, 140 Cal. App. 4th 488, 502 (2006), citing Venegas v. County of Los Angeles, 32 Cal. 4th 820, 841-43 (2004). Section 52.1 "require[s] an attempted or completed act of

---

[13] Damages recoverable under Cal. Civil Code 52(b) are as follows:

. . . (b) Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following:

(1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2) A civil penalty of twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney. An action for that penalty brought pursuant to Section 51.7 shall be commenced within three years of the alleged practice.

(3) Attorney's fees as may be determined by the court.

41

1   interference with a legal right, accompanied by a form of coercion." <u>Jones v. Kmart Corporation</u>,

2   17 Cal. 4th 329, 334 (1998) (quoted with approval in <u>City and County of San Francisco v.</u>

3   <u>Ballard</u>, 136 Cal.App.4th 381, 409 (2006)). "The essence of a Bane Act claim is that the

4   defendant, by the specified improper means (i.e., threats, intimidation or coercion), tried to or did

5   prevent the plaintiff from doing something he or she had the right to do under the law or to force

6   the plaintiff to do something that he or she was not required to do under the law." <u>Shoyoye v.</u>

7   <u>County of Los Angeles</u>, 203 Cal. App. 4th 947, 956 (2012) (citations and internal quotation marks

8   omitted). "Technically, whether a constitutional violation occurred and whether that violation

9   was accompanied by any threats, intimidation or coercion are separate analytical inquiries (albeit

10  with intertwining facts)." <u>Barsamian v. City of Kingsburg</u>, 597 F. Supp. 2d 1054, 1057 (E.D.

11  Cal. 2009).

12      "It may be true that this section and other similar California statutes were enacted in

13  response to the alarming increase in hate crimes.  Nevertheless, there is no requirement that the

14  violence be extreme or motivated by hate in the plain language of the sections, or in the cases

15  construing them; there is also no requirement that the act constitute a crime.  If the California

16  legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could

17  have explicitly said so." <u>Winarto v. Toshiba America Electronics Components, Inc.</u>, 274 F.3d

18  1276, 1289 (9th Cir. 2001) (citations and internal punctuation marks omitted).

19      The elements of a claim under section 52.1 are:

20          (1) that the defendant interfered with or attempted to interfere with
            the plaintiff's constitutional or statutory right by threatening or
21          committing violent acts; (2) that the plaintiff reasonably believed
            that if she exercised her constitutional right, the defendant would
22          commit violence against her or her property; that the defendant
            injured the plaintiff or her property to prevent her from exercising
23          her right or retaliate against the plaintiff for having exercised her
            right; (3) that the plaintiff was harmed; and (4) that the defendant's
24          conduct was a substantial factor in causing the plaintiff's harm.

25  <u>McCue v. South Fork Union Elementary School</u>, 766 F. Supp. 2d 1003, 1010 (E.D. Cal. 2011)

26  (citing <u>Austin B. v. Escondido Union School Dist.</u>, 149 Cal.App.4th 860, 882 (2007), and CACI

27  No. 3025).

28  ////

1          b. Analysis

2          Plaintiff asserts a violation of his alleged legal right to be free from unnecessary surgery,

3   and alleges that defendants interfered with that right through coercion, intimidation and threats,

4   by telling plaintiff that he would soon die if he did not have the surgery.

5          While this alleged claim meets the "reasonable person" test, see Winarto, supra, 274 F.3d

6   at 1289-90 ("whether a reasonable person, standing in the shoes of the plaintiff, would have been

7   intimidated by the actions of the defendants") (citations and internal punctuation marks omitted),

8   problems persist with this claim.

9          First, there is negligible authority for premising a Bane Act claim on alleged medical

10   negligence, or alleged deliberate indifference in a prison setting.  Plaintiff cites none.  While the

11   court has located a case which found that "deliberate indifference to an inmate's medical needs is

12   adequate to satisfy the 'threats, intimidation, or coercion' requirement of the Bane Act," M.H. v.

13   County of Alameda, 2014 WL 1429720, *38 (N.D. Cal. 2014), there is countervailing authority

14   for finding that "[i]ncarceration coupled with deliberate indifference to medical and psychiatric

15   needs does not constitute 'threats, intimidation, or coercion' for purposes of section 52.1," Lopez

16   v. County of Tulare, 2012 WL 33244, *11 (E.D. Cal. 2012).  Thus, precedent is lacking.

17          Second, the statute itself precludes an action based on speech alone:  "Speech alone is not

18   sufficient to support an action . . . except upon a showing that the speech itself threatens violence

19   against a specific person . . . ; and the person . . . against whom the threat is directed reasonably

20   fears that, because of the speech, violence will be committed against [him] . . . and that the person

21   threatening violence had the apparent ability to carry out the threat."  Cal. Civ. Code § 52.1(j).

22   Plaintiff's claims are premised on the allegedly coercive statements made by Dr. Beck and Dr.

23   Reddy.  No surgery could be performed on plaintiff without his consent, and plaintiff deemed the

24   surgery "violent" only after its completion, when he learned that it was "unnecessary."  Plaintiff's

25   allegations are properly framed as a lack-of-informed-consent claim, which lies in tort.  "If a

26   doctor fails to make reasonable disclosure and a prudent person in the patient's position would

27   have declined the procedure had disclosure been made, then the doctor may be held liable in

28   negligence if the risks inherent in the procedure materialize."  Mathis v. Morrissey, 11 Cal. App.

43

1   4th 332, 339 (1992) (citation omitted).

2          Finally, where the alleged coercion is inherent in the alleged violation of a legal right, the

3   requirement of "threats, intimidation, or coercion" is not met.  The statute requires a showing of

4   coercion independent from the alleged violation of a legal right.  See generally Shoyoye v.

5   County of Los Angeles, Cal. App. 4th 947 (2012), rehearing denied, review denied.  "[I]n order to

6   maintain a claim under the Bane Act, the coercive force applied against a plaintiff must result in

7   an interference with a separate constitutional or statutory right.  It is not sufficient that the right

8   interfered with is the right to be free of the force or threat of force that was applied."  Rodriguez

9   v. City of Fresno, 819 F. Supp. 2d 937, 2011 WL 1883195, *13 (E.D. Cal. 2011); accord, Lopez

10  v. County of Tulare, supra, 2012 WL 33244 at *11; Chavez v. County of Kern, 2014 WL 412562,

11  *8 (E.D. Cal. 2014).  Plaintiff's allegations that he was coerced or intimidated into have

12  unnecessary surgery are not independent from the alleged violation of plaintiff's right to be free

13  from unnecessary surgery.  Hence, from this perspective too, plaintiff's Section 52.1 claim again

14  collapses into a medical negligence claim.

15         For these reasons, summary judgment should be granted for both defendants on plaintiff's

16  claim under California Civil Code section 52.1.

17  IX.  Conclusion

18         For the foregoing reasons, IT IS HEREBY ORDERED that:

19         1.  All evidentiary objections are overruled, with the exception of plaintiff's objections to

20  the declaration of Dr. Reddy (see ECF No. 136 at 3-6), which are sustained in part.

21         In addition, IT IS HEREBY RECOMMENDED that:

22         1.  Defendant Dr. Reddy's motion for summary judgment (ECF No. 119), be granted in

23  full.

24         2.  Defendant Dr. Beck's motion for summary judgment (ECF No. 106), be granted in part

25  and denied in part.

26         3.  Defendant Dr. Beck's motion for summary judgment on plaintiff's state law claim

27  under California Civil Code section 52.1, be granted.

28  ////

44

1        4. Defendant Dr. Beck's motion for summary judgment on plaintiff's claims of deliberate

2    indifference to serious medical needs, and medical negligence, be denied.

3        5. This action proceed on plaintiff's claims against defendant Dr. Beck for deliberate

4    indifference to serious medical needs, and medical negligence.

5        These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10   objections shall be filed and served within fourteen days after service of the objections.  The

11   parties are advised that failure to file objections within the specified time may waive the right to

12   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13   Dated:  May 9, 2014

14

15   /elli2980.msj                        KENDALL J. NEWMAN
                                          UNITED STATES MAGISTRATE JUDGE
16

17

18

19

20

21

22

23

24

25

26

27

28

                                          45